No. 98-282

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 55

STATE OF MONTANA,

Plaintiff and Respondent,

v.

RUSSELL EUGENE WORRALL,

Defendant and Appellant.

APPEAL FROM: District Court of the Twelfth Judicial District,

In and for the County of Chouteau,

The Honorable Kenneth Neill, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jeremy S. Yellin, Havre, Montana

For Respondent:

Joseph P. Mazurek, Attorney General, John Paulson, Assistant Attorney General, Helena, Montana; Allin H. Cheetham, Chouteau County Attorney, Fort Benton, Montana

Submitted on Briefs: November 19, 1998

Decided: March 18, 1999

Filed:

_____

Clerk

## Justice James C. Nelson, delivered the Opinion of the Court.

¶1. Russell Eugene Worrall (Worrall) was charged by information with the offenses of criminal production or manufacture of dangerous drugs, criminal possession of dangerous drugs, and criminal possession of drug paraphernalia. The District Court for the Twelfth Judicial District, Chouteau County, denied Worrall's motion to suppress certain evidence. Thereafter, Worrall pleaded guilty to the offense of criminal manufacture of dangerous drugs, reserving the right to appeal his motion to suppress. The remaining charges against Worrall were dismissed. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

¶2. We address the following issues on appeal:

¶3. 1. Whether the unproven statements of a child informant may serve as the sole basis for the issuance of a search warrant.

¶4. 2. Whether the District Court erred in determining that Worrall failed to prove by a preponderance of the evidence that the application for a search warrant contained material false statements or omissions made knowingly, intentionally, or with reckless disregard for the truth.

¶5. 3. Whether the search warrant application contained sufficient probable cause for the issuance of the search warrant.

## Factual and Procedural Background

¶6. On September 27, 1997, 11-year-old Erik Cranmore (Erik) and his friends Dustin Dostal (Dustin) and Jerode Weber (Jerode), were hunting snakes near the sewer ponds north of Fort Benton. In their hunt, they wandered onto Worrall's property. As the boys entered the property, they were met by Worrall's son, James, who showed them an old snake pit behind Worrall's house. While on Worrall's property, Erik and Dustin saw what they believed to be marijuana plants.

¶7. The boys returned home and told Dustin's mother and Erik's grandmother about the plants. Erik and Dustin decided to report their observations to the Chouteau County Sheriff's Department. Hence, Erik and Dustin went to the Sheriff's department and met with Deputy Vernon Burdick (Burdick).

¶8. Burdick spoke with Erik and Dustin for about 15 minutes. The boys told Burdick that they saw marijuana plants growing on Worrall's property. When Burdick asked if they could have been tomato plants, Erik described the difference between marijuana plants and tomato plants. Burdick's account of other portions of this interview differs from that of the two boys. These differences form the basis of Worrall's appeal and will be addressed later in this opinion.

¶9. Burdick did not audio tape or video tape the interview, nor did he obtain written statements from Erik or Dustin or in any way memorialize the conversation. Although both Erik and Dustin stated that Burdick had pen in hand and that he was taking notes during the interview, Burdick denied that he had taken any notes.

¶10. After Erik and Dustin left, Burdick prepared a one-page report describing the interview and faxed it to the Tri-Agency Drug Task Force (the Task Force) in Havre. Deputy Monte Reichelt (Reichelt), team leader of the Task Force, phoned Burdick to discuss the report and to obtain more information about the two boys. Burdick told Reichelt that the boys seemed sincere and that they had never been in trouble before. However, at the hearing on Worrall's motion to suppress, Burdick admitted that he had met with Erik on two prior occasions after Erik had threatened other children.

¶11. Based upon Burdick's report and Reichelt's subsequent conversation with Burdick, Reichelt applied for a search warrant on September 30, 1997. Reichelt did not personally speak with Erik or Dustin. Neither Erik nor Dustin had been an informant previously.

¶12. A search warrant for Worrall's premises, curtilage, outbuildings and vehicles was issued that same day. On October 1, 1997, several law enforcement officers, led by Reichelt, executed the search warrant. In their search, the officers found four marijuana plants. Three were discovered in a ravine southwest of Worrall's house and one was discovered near the southeast corner of the house. Additional amounts of marijuana, marijuana stems, and drug paraphernalia were found in Worrall's house and outbuildings.

¶13. On October 31, 1997, Worrall was charged by information with the offenses of criminal production or manufacture of dangerous drugs, a felony, in violation of § 45-9-110, MCA; criminal possession of dangerous drugs, a felony, in violation of § 45-9-102, MCA; and criminal possession of drug paraphernalia, a misdemeanor, in violation of § 45-10-103, MCA. On December 24, 1997, Worrall filed a motion to suppress the evidence seized in the search of his home contending that the search warrant application contained a number of material false statements made knowingly, intentionally or with reckless disregard for the truth. Attached to Worrall's motion were affidavits from Erik and Dustin disputing several of the statements Burdick had included in his report regarding their conversation with him.

¶14. A hearing on Worrall's motion was conducted on March 3, 1998, wherein testimony was elicited from Erik, Dustin, Burdick, Reichelt and Worrall. In an order filed on March 18, 1998, the District Court denied Worrall's motion to suppress concluding that Worrall had not proven that the information in the application for a search warrant contained deliberate falsehoods or that information was included in reckless disregard for the truth. Hence, the court concluded that there was probable cause to issue the search warrant.

¶15. Pursuant to a plea agreement, Worrall pleaded guilty to the offense of criminal manufacture of dangerous drugs and reserved his right to appeal the denial of his motion to suppress. The remaining charges against Worrall were dismissed.

¶16. On May 7, 1998, the District Court deferred imposition of Worrall's sentence for eighteen months upon certain conditions. Worrall appeals the denial of his motion to suppress.

## Standard of Review

¶17. The standard of review of a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Kuneff*, 1998 MT 287, ¶ 6, ___ P.2d ___, ¶ 6, 55 St. Rep. 1173, ¶ 6 (citing *State v. Siegal* (1997), 281 Mont. 250, 257, 934 P.2d 176, 180).

## Issue 1.

¶18. *Whether the unproven statements of a child informant may serve as the sole basis for the issuance of a search warrant.*

¶19. Worrall contends that the District Court erred in holding that probable cause existed for the issuance of the search warrant because unverified statements of an unproven informant, much less a child informant, cannot serve as the sole basis for issuance of a search warrant. He argues that allowing a search of his property based upon the uncorroborated claim of an unproven 11-year-old child, after only a fifteen-minute interview, was unreasonable.

¶20. In *Kuneff*, we observed that information provided to the police that is motivated by good citizenship is a reliable basis for determining probable cause. *Kuneff*, ¶ 24 (citing *State v. Oleson*, 1998 MT 130, ¶ 14, 959 P.2d 503, ¶ 14, 55 St.Rep. 517, ¶ 14). Nothing in the record indicates that Erik's report should be viewed more critically than similar reports from adult citizen informants. This court has not required a greater showing of probable cause where the citizen informant happened to be under the age of eighteen. Moreover, Worrall did not challenge the competency of either Erik or Dustin at the suppression hearing. Both Erik and Dustin testified without objection as to their abilities to tell the truth and to express themselves concerning their personal observations.

¶21. The search warrant application related that Erik personally observed marijuana plants on Worrall's property, that he recognized the plants as marijuana, and that he knew the difference between marijuana plants and tomato plants. These assertions were sufficient to demonstrate the reasonable probability that Erik's information was reliable and not merely speculative.

¶22. Although Worrall complains that Erik's statements were not corroborated by law enforcement officers, this Court has made clear that corroboration is unnecessary under the circumstances of this case. "[C]orroboration of an informant's information through other sources is only necessary when the information is hearsay or the informant is anonymous." *State v. Adams* (1997), 284

Mont. 25, 37, 943 P.2d 955, 962 (citing *State v. Rinehart* (1993), 262 Mont. 204, 212, 864 P.2d 1219, 1224). The informant in *Adams* personally observed the marijuana growing operation and he was not an anonymous informant. Consequently, we concluded that corroboration of his information was not necessary. *Adams*, 284 Mont. at 37, 943 P.2d at 962. Here, as in *Adams*, Erik was not an anonymous informant and the information he provided was based upon personal observation, not hearsay. Hence, corroboration of the information he provided to Burdick was unnecessary.

¶23. Accordingly, we hold that the unproven statements of a child informant may serve as the sole basis for the issuance of a search warrant.

## Issue 2.

¶24. *Whether the District Court erred in determining that Worrall failed to prove by a preponderance of the evidence that the application for a search warrant contained material false statements or omissions made knowingly, intentionally, or with reckless disregard for the truth.*

¶25. In his motion to suppress, Worrall contended that certain of the statements made in the application for a search warrant were knowingly or intentionally false or made with reckless disregard for the truth. He argued that if the false material were excised from the application, insufficient information remained to establish probable cause for the issuance of the search warrant.

¶26. At the suppression hearing, the court heard testimony of Erik, Dustin, Burdick, Reichelt and Worrall. Erik's and Dustin's testimony differed in several respects from that of Burdick regarding what they had told Burdick about seeing marijuana plants on Worrall's property. Nevertheless, the District Court denied Worrall's motion concluding that Worrall did not prove that the application for a search warrant contained deliberate falsehoods or that information was included in the application in reckless disregard for the truth. In addition, the court determined that "the application provided a substantial basis for the probability that criminal activity was occurring on [Worrall's] property."

¶27. The Fourth Amendment to the United States Constitution and Article II, Section 11 of the Montana Constitution protect a person's right to be free from unlawful searches and seizures by requiring that a search warrant may not be issued until probable cause is shown to exist. *Rinehart*, 262 Mont. at 209-10, 864 P.2d at 1222. Furthermore, § 46-5-221, MCA, provides that a judge may only issue a search warrant upon an application made under oath or affirmation that states facts sufficient to support probable cause to believe that an offense has been committed and that evidence or contraband connected with the offense may be found in a particularly described place.

¶28. To determine whether a search warrant should be issued, the judge evaluates the facts asserted within the four corners of the application and makes a practical, common-sense decision as to whether there is a fair probability that incriminating items will be found in the place to which entry is sought. *State v. Sundberg* (1988), 235 Mont. 115, 119, 765 P.2d 736, 739. "The test is not to determine whether each individual fact presented in the application for search warrant establishes probable cause, but to determine from the totality of the circumstances whether there is probable cause." *Kuneff*, ¶ 27 (citing *Illinois v. Gates* (1983), 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L.Ed.2d 527).

¶29. Based on the assumption that the factual showing establishing probable cause must be truthful in the sense that the information put forth in the warrant application is believed or appropriately accepted by the affiant as true, the United States Supreme Court determined that a criminal defendant may challenge the truthfulness of the factual statements made in an application for a search warrant. *Franks v. Delaware* (1978), 438 U.S. 154, 165, 98 S.Ct. 2674, 2681, 57 L.Ed.2d 667). Thus, the procedure the Supreme Court set forth in *Franks* requires not only that the defendant show that the application contains false statements, but also that the defendant make a substantial showing that those false statements were made knowingly, intentionally or with a reckless disregard for the truth. If the defendant makes such a showing, and the misstatement was necessary to a finding of probable cause, then a hearing must be held at defendant's request. When a hearing is held, the allegation of perjury or reckless disregard must be proved by defendant by a preponderance of the evidence. Once proved, the offending information must be excised from the warrant application. If, after the egregious material is excised, the remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded. *Franks*, 438 U.S. at 155-56, 98 S.

Ct. at 2676).

¶30. *Franks* also requires that, in order to make a preliminary showing of an intentionally made falsehood, the defendant must provide more than conclusory statements. Instead, the defendant must make an offer of proof that contains affidavits, sworn statements or other reliable witness statements which tend to prove that false statements in the application were deliberately made. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. Moreover, under the *Franks* procedure, allegations of negligence or innocent mistake are insufficient to excise the allegedly false information. *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684.

¶31. We adopted the *Franks* procedure in *State v. Sykes* (1983), 194 Mont. 14, 663 P.2d 691 (*overruled on other grounds by State v. Long* (1985), 216 Mont. 65), and affirmed its use in *State v. Mosley* (1993), 260 Mont. 109, 860 P.2d 69. However, in *Mosley,* and again later in *State v. Feland* (1994), 267 Mont. 112, 882 P.2d 500, Justice Trieweiler, although concurring in the result of both cases, questioned placing the burden upon the defendant of proving that the false statements were made knowingly, intentionally, or with reckless disregard for the truth. Justice Trieweiler questioned that if false information is provided in support of an application for a search warrant, how can the person whose privacy has been illegally violated prove the state of mind of the person who provided the information? *Mosley*, 260 Mont. at 122, 860 P.2d at 77 (Trieweiler, J., concurring in part and dissenting in part); *Feland*, 267 Mont. at 116, 882 P.2d at 502 (Trieweiler, J., concurring).

¶32. In his concurrence in *Feland*, Justice Trieweiler suggested that a better procedure for challenging the veracity of information in an application for a search warrant would be to require the defendant to make a substantial preliminary showing that false information was included in the application or affidavit in support of the search warrant. If the defendant makes such a showing, then a hearing must be held wherein the defendant must prove, by a preponderance of the evidence, that the information is untrue. If proven untrue, then the information must be excised from the application and a determination must be made whether there is sufficient probable cause without the excised information. If not, the search warrant must be voided and the fruits of the search excluded. *Feland*, 267 Mont. at 117, 882 P.2d at 503 (Trieweiler, J., concurring).

¶33. We now hold this to be the better practice. As previously stated, a judge or

magistrate is required to evaluate only the facts asserted within the four corners of a search warrant application. *Sundberg*, 235 Mont. at 119, 765 P.2d at 739. If inaccurate or misleading information is included in that application, it must be excised from the application regardless of whether that information was included mistakenly, negligently or intentionally. A search based upon a warrant application which contains material misstatements and inaccurate information may skew the magistrate's determination of probable cause. Importantly, such a search is no more reasonable nor less an invasion of privacy merely because the misstatements and inaccuracies were made mistakenly, unintentionally or negligently. Divining the intent of the search warrant applicant is irrelevant; misstatements and inaccuracies, whether intentional or unintentional, may produce the same constitutionally impermissible result--a search based upon something other than probable cause.

¶34. Accordingly, we now modify our use of the *Franks* procedure to hold that a defendant need not prove that the person providing false information in the application for a search warrant did so knowingly, intentionally or with a reckless disregard for the truth before those false statements may be excised. To this end, our holdings in *Sykes*, *Mosley*, *Feland* and other similar Montana cases are modified to the extent of our adoption of this rule.

¶35. Having so held, we next review the District Court's determination regarding each of Worrall's allegations of false information. In his motion to suppress, Worrall contended that there were at least four false statements in the application for the search warrant and one omission of material fact. In addition, at the close of the hearing on his motion to suppress, Worrall pointed out that the search warrant application also omitted a material fact regarding the prior observation of his property by law enforcement personnel. We will discuss each statement or omission in turn.

¶36. The first allegedly false statement in the warrant application pertains to Erik's ability to identify marijuana plants. The search warrant application stated:

Deputy Burdick asked the eleven year old [Erik] how he knew it was a marijuana plant. The boy told Deputy Burdick he has seen marijuana plants before. His aunt, who lives in another state was growing a plant for awhile in her house. He saw it when he was over at her house.

At the hearing, Erik testified that he told Burdick that his aunt had a fake marijuana plant,

not a real one. Burdick, on the other hand, testified that he did not discuss with Erik whether the plant was real or fake.

**¶37. Worrall contends that Erik's comparison of the plants growing on Worrall's property to a fake marijuana plant, is much less persuasive than a comparison to a live marijuana plant. However, the District Court did not find this conflict to rise to the level of a material factual discrepancy. We agree. Even if the plant Erik had seen at his aunt's house were fake, Worrall has failed to demonstrate that it would not have given Erik a good indication of what a live marijuana plant looks like.**

**¶38. Additionally, in its order denying Worrall's motion to suppress, the District Court noted that Erik also based his identification on pictures of marijuana plants that he had seen in magazines. However, this reference to pictures in magazines was not mentioned in the warrant application. The totality of the circumstances may be derived only from the information given to the impartial magistrate and reduced to writing within the four corners of the search warrant application. *Thomson v. Onstad* (1979), 182 Mont. 119, 122-23, 594 P.2d 1137, 1139; *State ex rel. Townsend v. District Court* (1975), 168 Mont. 357, 362-63, 543 P.2d 193, 196. Subsequent information, such as Erik's testimony that he could identify marijuana based on pictures he had seen in magazines, cannot be used to determine whether there was adequate support for issuance of the search warrant. Accordingly, the District Court erred in considering this testimony in its consideration of Worrall's motion.**

**¶39. The second allegedly false statement in the warrant application pertains to the location of the plants. The warrant application stated:**

The eleven year old said as they were on the north side of the house there was a porch. Under the porch the eleven year old saw about forty marijuana plants.

At the hearing, both Erik and Dustin testified that they did not tell Burdick that they saw the marijuana plants under a porch. Instead, both boys testified that they told Burdick that they saw the plants in a pit in the back yard.

**¶40. Worrall argues that a child's statement that he saw marijuana growing in a pit is much less persuasive than stating that he saw marijuana plants growing in a controlled environment, such as under a porch. While we have already stated that a child informant's statements are no less reliable than an adult informant's statements, we agree with Worrall that marijuana plants growing under a porch are more indicative of criminal activity than marijuana plants growing in a pit.**

**¶41. The third allegedly false statement in the warrant application pertains to Erik's credibility. The warrant application stated:**

Your applicant has discussed the information with Deputy Burdick. Deputy Burdick believes the boys are sincere. Deputy Burdick states that the boys have not been in trouble in Ft. Benton.

Worrall contends that Erik had been in trouble on two prior occasions for using foul language and threatening other children. However, Burdick testified at the hearing that he knew both boys and that he did meet with Erik twice for disciplinary reasons, but in an unofficial capacity. The District Court determined that neither incident involving Erik rose to the level of "being in trouble" because neither incident resulted in any kind of juvenile proceedings. We agree.

**¶42. The fourth allegedly false statement in the warrant application pertains to a depiction of marijuana plants on cigarette lighters. The warrant application stated:**

Deputy Burdick asked both boys if maybe they weren't mistaken, the plants could be tomato plants. The boys replied that they weren't tomato plants. The leaves on these plants were the same kind of leaves that they put on lighters. The boys also told Deputy Burdick they didn't see any tomatoes on the plants.

. . .

. . . The boys, even though they are young, compared the leaves on the plants to pictures that are put on cigarette lighters that sport a marijuana emblem. These boys had to have seen marijuana plant emblems on lighters before in order to compare them with the plants themselves.

At the hearing on Worrall's motion to suppress, while Erik testified that he told Burdick that he had seen pictures of marijuana plants on lighters, Dustin testified that he told Burdick that the plants did not look like the emblems on lighters. The District Court determined that the discrepancy was probably the result of a misunderstanding.

¶43. Worrall also alleges error in the omission of certain information from the search warrant application. At the suppression hearing, Dustin testified that he told Burdick that the only reason he believed the plants to be marijuana was because Erik said so. Worrall contends that the application conveys the message that both boys recognized marijuana when in reality Dustin based his recognition on Erik's ability to identify marijuana.

¶44. The State argues that Worrall raises this alleged omission for the first time on appeal and that we should thus decline to address it. We disagree. In his motion to suppress, Worrall pointed out that Dustin stated in his affidavit that he had told Burdick that he had never seen a marijuana plant before. We hold that this was sufficient to raise the question of whether Dustin was able to identify marijuana on his own or whether he based his recognition on Erik's ability to identify marijuana.

¶45. Worrall also alleges error in the omission from the search warrant application that law enforcement officers viewed his property the night before applying for the search warrant and that no evidence of a marijuana growing operation was observed. Testimony of this fact was elicited from both Burdick and Reichelt at the suppression hearing. Worrall contends that this information was material and should have been contained in the application. The District Court did not address this argument in its order. Nevertheless, it is clear from Reichelt's and Burdick's testimony that the inclusion of information about this nighttime observation of Worrall's property would not have added anything to the probable cause analysis. It might have made a difference if Reichelt had testified that they had a clear view of Worrall's property and yet they observed nothing, but that was not the case. Rather, he testified that it was too dark to see anything from their vantage point.

¶46. In summary, we conclude that: 1) the conflict over whether Erik's aunt's marijuana plant was real or fake does not rise to the level of a material factual discrepancy; 2) Erik's subsequent testimony that he could identify marijuana plants based on pictures he had seen in magazines cannot be used to support a

determination that there was adequate probable cause for the issuance of the search warrant because that information was not contained within the four corners of the search warrant application; 3) neither incident of reprimanding Erik for using foul or threatening language resulted in any kind of juvenile proceeding, thus the statement in the search warrant application that the boys had not been in trouble in Fort Benton was not false; and 4) the nighttime view of Worrall's property was properly omitted from the search warrant application because it would have added nothing to the probable cause analysis.

¶47. As to the remaining statements--that the boys saw marijuana in a pit rather than under the porch and that Dustin did not identify the plants as looking like the emblems on certain cigarette lighters--and the omission--that Dustin based his identification of the marijuana plants on Erik's say so--the District Court based its determination not to excise this information on our prior holdings in *Sykes*, *Mosley* and *Feland* that Worrall must prove that any false information was included knowingly, intentionally or with a reckless disregard for the truth. Since we have now modified the burden of proof in such cases so that a defendant need only prove, by a preponderance of the evidence, that such statements were indeed false, we remand this case to the District Court for further proceedings consistent with this holding.

¶48. At the same time, we recognize that the District Court, in making that determination, will be hampered by the fact that Burdick did not memorialize the interview with the two boys. Over the last several years we have been presented with this problem in other contexts: *State v. Grey* (1995), 274 Mont. 206, 907 P.2d 951 (advising defendants of their *Miranda* rights and defendants' waiver of those rights); *State v. Weaver*, 1998 MT 167, 964 P.2d 713, 55 St.Rep. 668 (interviewing child sexual abuse victims); *State v. Siegal* (1997), 281 Mont. 250, 934 P.2d 176 (scanning structures with thermal imagers).

¶49. While we have not, to date, held that law enforcement officers *must* memorialize the giving of *Miranda* warnings prior to interrogation or interviews with witnesses, we have concluded that this may be the better practice where there are present no exigent circumstances and where the interview or interrogation takes place within the controlled environment of the station house. *Grey*, 274 Mont. at 213-14, 907 P.2d 955-56. For example, in *Grey* we held that

in the context of a custodial interrogation conducted at the station house or under other similarly controlled circumstances, the failure of the police officer to preserve some tangible record of his or her giving of the *Miranda* warning and the knowing, intelligent waiver by the detainee will be viewed with distrust in the judicial assessment of voluntariness under the totality of circumstances surrounding the confession or admission. That is all the more so where the evidence demonstrates that, as here, the police officer made a conscious decision not to secure a written waiver or otherwise preserve his giving of the *Miranda* warning and the detainee's waiver on the premise that to do so would alert the accused to exercise his rights and, thus, jeopardize the interrogation.

*Grey*, 274 Mont. at 214, 907 P.2d at 956. Similarly, in *Siegal*, we stated that

absent the demonstration of a legitimate and compelling reason to the contrary, the failure of law enforcement officers to preserve some tangible record of the results of a thermal imaging scan should be viewed with distrust in the judicial assessment of the interpretation of those results.

*Siegal*, 281 Mont. at 278, 934 P.2d at 193 (citing *Grey*, 274 Mont. at 214, 907 P.2d at 956).

**¶50. In adopting these rules, we were not and are not unmindful of a guiding principal of appellate review that the fact finder is uniquely in the best position to judge the credibility of witnesses and that we will not interfere with such determinations. *State v. Flack* (1993), 260 Mont. 181, 188-89, 860 P.2d 89, 94 (citing *Nave v. State Comp. Mut. Ins. Fund* (1992), 254 Mont. 54, 58-59, 835 P.2d 706, 709). In the case at bar, even though the District Court did not indicate one way or the other, by accepting Burdick's version of the interview and rejecting Erik's and Dustin's version, the trial court impliedly determined that Burdick was the more credible witness.**

**¶51. While these sorts of credibility determinations clearly are for the trial court to make, we, nonetheless, recognize that when the witness is a law enforcement officer, a criminal accused has an uphill battle, to say the least, in mounting an effective challenge to the credibility of such a witness. Law enforcement officers are, after all, public officers sworn to uphold the law. They frequently testify in court under oath and, presumably, they do so truthfully. They are in the business of gathering and preserving evidence thoroughly, competently and accurately. Thus, in a no-record**

swearing match between a law enforcement officer and an accused or a witness, the officer has at least the initial advantage

simply by reason of his or her office, experience and training when it comes to the issue of credibility.

¶52. For these reasons, it is troubling when we are presented with situations, as more frequently we are, where the law enforcement officer has failed to gather evidence and preserve the results of his or her investigation utilizing even the most elemental tools of recordation. Even more troubling is the suggestion that this may not be simply the result of negligence or sloppy police work, but rather, consciously done with an ulterior motive that belies the officer's obligation to respect the accused's constitutional rights and to preserve an accurate, complete and truthful record of the investigation. For example, in *Grey*, the defendant alleged that he was not given adequate *Miranda* warnings and that he did not voluntarily, intelligently and knowingly waive his rights. *Grey*, 274 Mont. at 209, 907 P.2d at 953. As indicated above, the officer chose not to obtain a written waiver on the proposition that to do so would jeopardize his interview by alerting the accused to exercise his rights to counsel and to remain silent. *Grey*, 274 Mont. at 214, 907 P.2d at 956. In *Weaver,* the defendant alleged that the investigating officer's interviews of the children were unduly suggestive or coercive and irremediably altered the children's perception of evens. *Weaver*, ¶ 44. The investigating officer testified that she does not record or take notes of the interviews in such cases so that the victims will not be further traumatized during the process of disclosing embarrassing information. *Weaver*, ¶ 15. And, in *Siegal*, because the heat signatures from a thermal imaging scan are subject to interpretation, the defendant alleged that the State's failure to make a videotape of the results obtained by the thermal imager constituted the destruction of exculpatory evidence, although the officer explained that his choice not to record the results of the thermal imager scan was logistical rather than tactical. *Siegal*, 281 Mont. at 254-55, 278, 934 P.2d at 178, 192-93. These specific fact situations aside, the point to be made is that, absent a concession from the law enforcement officer, charges of ulterior motive are difficult if not impossible to substantiate.

¶53. More importantly, however, this problem simply does not have to exist at all. We doubt that there is a police station or sheriff's office in Montana that does not have paper and pens for note-taking and, more than likely, a typewriter for preparing statements, a tape recorder for recording those, and, in many cases, audio-

visual recording equipment. Memorializing the reading of an accused's rights, or an accused's confession or, as in the case at bar, a citizen informant's statement in the controlled environment of the station house, absent exigent circumstances, is neither an onerous nor a high-tech enterprise. Importantly, doing so avoids the sort of "who said what to whom" challenges that require trial courts to be arbiters of the credibility disputes that are nearly always resolved against the defendant. Indeed, we cannot envision any legitimate reason why the investigating officer would not--in the ordinary case--memorialize in some fashion the taking of a witness's or informant's statement and, instead, choose to rely on his or her own memory of what was said, when the accuracy of those recollections might become critical weeks or months after the interview in proceedings implicating the fundamental rights of the defendant as well as the very ability of the state to successfully prosecute the case. No part of the criminal justice system, be it law enforcement, the prosecution, the defense, or the court, is well-served by this sort of slipshod approach.

¶54. Obviously, the courts cannot write protocols, policy and procedures for police departments and sheriff's offices. However, when the need to protect the fundamental rights of citizens under our Constitution arises, the courts can adopt evidentiary rules for assessing the credibility of witnesses and the weight to be accorded to their testimony. We conclude that the facts of this case highlight the problem and require our extension of the *Grey, Weaver* and *Siegal* rules to situations where the law enforcement officer, absent exigent circumstances or other compelling reason, fails to memorialize in some manner the statement of a witness or informant made within the station house or a similarly controlled environment and where the statement forms the substantial basis for the issuance of a search warrant or otherwise provides the grounds for the state's invasion of a fundamental constitutional right or interest guaranteed to the defendant.

¶55. Accordingly, in the case *sub judice*, we hold that, absent the demonstration of exigent circumstances or some other compelling reason, the failure of the investigating officer to preserve some tangible record of the citizen informant's statements made in the controlled environment of the station house, will be viewed with distrust in the judicial assessment of the truthfulness of the state's declarations made in the search warrant application to the extent those declarations are based on the citizen informant's statements. Thus, the statements that the boys saw marijuana under Worrall's porch, that Dustin identified the plants as looking like the emblems on certain cigarette lighters, and that Dustin could identify the plants as marijuana,

should all be viewed with distrust in any further assessment of the truthfulness of the state's declarations in the search warrant application.

## Issue 3.

¶56. *Whether the search warrant application contained sufficient probable cause for the issuance of the search warrant.*

¶57. In *State v. Kuneff*, 1998 MT 287, ¶ 18-19, ___ P.2d ___, ¶ 18-19, 55 St.Rep. 1173, ¶ 18-19, we overruled previous decisions wherein this Court had held that a magistrate's determination of probable cause should receive great deference, and that such determinations should be upheld if there is a substantial basis for them. We stated in *Kuneff:*

As a matter of logic and common sense, a reviewing court cannot defer to a magistrate's consideration of an application for search warrant that the magistrate in effect did not review. . . . [I]t would therefore be inappropriate to deferentially review the magistrate's determination that the application for search warrant established probable cause. . . .

*Kuneff*, ¶ 19.

¶58. Thus, we held in *Kuneff* that when the issuance of a search warrant is based in part on illegal information, the reviewing court shall excise the illegally obtained information from the application for search warrant and review the remaining information *de novo* to determine whether probable cause supported the issuance of a search warrant. *Kuneff*, ¶ 19.

¶59. Using this approach, we remand this case to the District Court to conduct a *de novo* hearing on Worrall's motion to suppress consistent with our previous determinations in this opinion.

¶60. Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ JIM REGNIER

/S/ TERRY N. TRIEWEILER

/S/ WILLIAM E. HUNT, SR.

/S/ W. WILLIAM LEAPHART

Justice Karla M. Gray, concurring in part and dissenting in part.

**¶61. I concur in the Court's opinion on issue one, relating to using the unproven statements of a child informant as the basis for the issuance of a search warrant. I also join that opinion on issue three, extending the *Grey* and *Siegal* rules to cover a situation such as that before us in the present case. I respectfully dissent, however, from the portion of the Court's opinion on issue two in which the Court throws out 15 years of case law by rejecting the *Franks* procedure absent any request by a party to the case for such an action.**

**¶62. It is important for me to note at the outset that I joined Justice Trieweiler's special concurring opinion in *Mosley* which is adopted by the Court in the present case. Moreover, it remains my view that the *Franks* approach may be a nearly impossible burden for a person challenging information provided in support of an**

application for a search warrant. Indeed, I would be interested in addressing the *Franks* issue again in a case where that issue was presented to us for resolution.

**¶63. That said, however, I strenuously disagree with the Court's rejection of *Franks*-- and its related "modification" of *Sykes*, *Mosley* and *Feland*--in the case presently before us. *Franks*--via *Sykes*, *Mosley* and *Feland*--is the controlling law in Montana and the appellant in this case did not argue at the District Court, and does not argue here, that *Franks*--and our cases applying it--should be modified or overruled. The appellant's argument was and is that he met the *Franks* burden; the State argues to the contrary and the District Court decided the issue in the State's favor. Under such a circumstance, and for reasons nearly identical to those set forth at some length in my recent dissent in Craig v. Schell, 1999 MT 40, it is entirely inappropriate for the Court to simply adopt *sua sponte* a concurring opinion from an earlier case and plunk it into the middle of this case, thereby creating new precedent on an important issue of law without the benefit of any arguments from the parties litigant. Indeed, the author of the Court's opinion in this case has stated my position here cogently and eloquently:**

[I]t is our obligation to decide the cases filed in this Court on the basis of the issues and arguments raised by the parties. In my view the best decisions result where both sides have had the opportunity to vigorously argue and challenge the positions and authorities of the other side. While the temptation is often great to decide a case on the basis of the argument that "should have been made," but was not, in blind-siding an issue we run the very real risk of substituting advocacy for neutrality.

State v. Zabawa (1996), 279 Mont. 307, 318, 928 P.2d 151, 158 (Nelson, J., specially concurring). I cannot understand the Court's decision now to "give in" to "temptation" rather than waiting for "opportunity to knock" in the guise of an actual argument related to rejecting *Franks*. Nor can I understand the Court's cavalier treatment of *stare decisis* and of our proper role in deciding cases on the basis of the arguments actually raised by the parties. Furthermore, as I suggested in my dissent in *Craig*, I cannot see how we ever will-- or can--exercise judicial restraint in any future case now that we have started down such a troubling path.

**¶64. It is not this Court's role to change the nature of the cases before us--to the detriment of the law, at least one litigant in each case and the district courts--in order**

to re-address issues raised and resolved in the past, but not before us now, and on which we do not have the benefit of briefing by parties both for and against the action the Court has decided on its own to take. I dissent.

¶65. Additionally, while it is clear from Justice Nelson's concurrence that we generally agree regarding the importance of *stare decisis*, that concurring opinion does not provide any support for the Court's approach in the present case. In particular, I cannot agree with the suggestion therein that *Roosevelt* is a relevant and recent instance where the Court--myself included--improperly decided the case on a theory never presented in the district court or on appeal. That case involved an equal protection challenge to a tax statute in which the trial court concluded that the statute, on its face, was an unconstitutional denial of equal protection. *Roosevelt*, ¶ 16. On appeal, we discussed at length the necessity and propriety of judicial restraint in constitutional interpretations and, faced with the equal protection issue, decided it narrowly on an "as applied" basis rather than a "facial invalidity" basis. *Roosevelt,* ¶ 46. There, we were applying fundamental principles of constitutional adjudication which have no relevance or application in the present case.

¶66. Nor can I agree with the concurrence's notion that, once we have erroneously articulated a principle or theory of law, "there is little likelihood the practicing bar will challenge the erroneous theory or principle or that a trial court will simply ignore the offending precedent." Indeed, it is my view that an oft-used purpose of concurring and dissenting opinions is to "sow the seeds" for a later change in existing law by providing an alternative analysis to that adopted by this Court and, moreover, it is my experience that the practicing bar frequently argues an approach set forth in an earlier concurring or dissenting opinion as the basis for a change in existing precedent. A recent example of this relatively common use of separate opinions by the practicing bar involves the *Fertterer* and *Gatts* cases, decided in 1992 and 1996, respectively. In *Fertterer*, this Court rendered an interpretation of § 87-1-102, MCA (1989), a fish and game statute, and the dissent on that issue pointed out the errors in the Court's statutory interpretation. *See Fertterer,* 255 Mont. at 81, 85-88, 841 P.2d at 471, 474-76. In the subsequent *Gatts* case, the defendant moved the trial court to dismiss a criminal mischief charge based on the same statute as was at issue in *Fertterer,* on the grounds that the charge was inappropriate and inconsistent with the plain language of the statute. The prosecution argued that *Fertterer* was dispositive, the trial court denied the motion to dismiss based on *Fertterer*, and the defendant appealed, urging that *Fertterer* was incorrectly decided and requesting

that we overrule it. We did so, on the basis that *Fertterer* was manifestly incorrect. *See Gatts*, 279 Mont. at 51-52, 928 P.2d at 120. *Gatts* is readily and easily distinguishable from the present case, and I submit that *Gatts* reflects the appropriate use of concurring and dissenting opinions; the present case, where the "modification" of our cases applying *Franks* has never been argued by any party or considered by the District Court, does not.

¶67. Furthermore, I disagree with Justice Nelson's suggestion that, once the "seeds" of an alternative approach to existing precedent have been "sown" by a concurring or dissenting opinion, it is appropriate for this Court to simply abandon its own precedent where no party has attempted to "produce a bountiful harvest." Indeed, while Justice Nelson correctly notes that we did not take up Justice Trieweiler's *Mosley* "invitation" in *Feland*, the reason was--as it should be here--that no party asked us to do so. Cases before this Court are brought by parties litigant whose obligation it is to raise the issues they want this Court to address and resolve. When they do not raise an issue or argument this Court might feel would be "productive" in changing the law, so be it. It is simply wrong for this Court to start righting all the wrongs it may perceive to exist in the law without regard to the fact that the parties apparently do not perceive the same problems.

¶68. Nor, of course, is it necessary for a trial court to "simply ignore" existing precedent in order for an issue regarding changing existing law to be preserved for appeal; all that is necessary, as illustrated by *Gatts*, is that the precedent be raised, and either applied or rejected by the trial court; in such circumstances, the appellant is entirely free to argue on appeal that the trial court erred in applying or rejecting the precedent and this Court is equally free to revisit the precedent, ever mindful of the importance of *stare decisis*, and determine whether it was manifestly incorrect. These circumstances are not present in the case now before us where Worrall merely argued in the District Court--and argues on appeal--that he met the *Franks/Sykes/ Mosley/Feland* approach.

¶69. On a related point, Justice Nelson's stated concern that a challenge to an allegedly erroneous theory or principle could subject the party or attorney presenting the challenge to sanctions is disingenuous. A Rule 11, M.R.Civ.P., sanction would not be available under such a situation because the rule expressly recognizes that a party or attorney is warranted in presenting a good faith argument for the "reversal of existing law." Similarly, sanctions are available under Rule 32, M.R.App.

P., only where an appeal is taken "without substantial or reasonable grounds." While not specifically articulated therein, it is clear that Rule 32 essentially incorporates the same standard for sanctions contained in Rule 11. Thus, while Worrall could have made a good faith argument for "modifying" our *Franks* cases in the District Court--and here on appeal--and could have done so without risk of sanction, he did not do so. I simply do not believe that it is our place to make--and resolve--the argument for him.

¶70. Finally, I agree entirely with Justice Nelson's reiteration of the *Formicove* and *Gatts stare decisis*-related principles. The circumstances giving rise to our restatement and application of those principles in the referenced cases, however, do not exist in the present case and, as a result, those cases do not support the Court's "modification" of *Sykes, Mosley* and *Feland* here. The pertinent background in *Gatts* is discussed above and need not be repeated here. Similarly, in *Formicove*, the trial court specifically relied on controlling precedent from this Court in interpreting a statute and the appellant squarely presented the issue of whether the precedent was correctly decided on appeal. Like both of those cases, the District Court in this case relied on existing precedent--that is, our *Franks* line of cases--in considering Worrall's challenge to the sufficiency of the search warrant; unlike *Gatts* and *Formicove*, however, Worrall does not argue on appeal for the "modification" of those cases. Simply stated, the cases do not support the Court's approach in the present case.

¶71. I do not doubt that Justice Nelson is correct in asserting that none of us is 100% "pure" in our application of *stare decisis* or, perhaps, other important principles of appellate practice. It is my view, however, that we must zealously guard against the inclination to become cavalier in ignoring the importance of *stare decisis* and in overruling precedent, and I fear that, once we start raising and resolving issues *sua sponte* which result in overruling controlling precedent, we will be unable to restrain ourselves in the future. For these reasons, I simply cannot agree with the Court's decision to modify three cases which no party has requested us to modify. I dissent.

/S/ KARLA M. GRAY

Justice James C. Nelson concurs:

¶72. I write separately to respond to Justice Gray's dissent. As a general proposition, I do not disagree with her concern about this Court deciding cases on the basis of theories and arguments neither made in the trial court nor advanced by the parties. That is the general rule to which we adhere in the vast number of cases. Moreover, without fear of contradiction, I know that each member of the present Court has, in one case or another, taken exactly the same position as does Justice Gray in her dissent. In this regard, Justice Gray cites my special concurrence in *State v. Zabawa* (1996), 279 Mont. 307, 318, 928 P.2d 151, 158. That concurrence still correctly sets forth my view.

¶73. However, I also know without much fear of contradiction that each member of the present Court has, at one time or another and for reasons that were apparently persuasive to the individual Justice at the time, authored or signed opinions where these general principles of appellate practice were not followed. See, for example, our recent decision in *Roosevelt v. Montana Dept. of Revenue,* 1999 MT 30, ___ P.2d ___, 56 St.Rep. 125, wherein the majority, which included the dissenting Justice here, decided the case on a theory neither raised nor argued by either party nor advanced in the trial court. *Roosevelt*, ¶ 67 (Nelson, J., dissenting). No doubt the Justices in the majority of that decision determined that there were valid reasons for deciding the case as they did, and in support of the opinion, Justice Gray defends her vote in *Roosevelt* by reiterating the majority's rationale for not following the rule that she now so staunchly defends. However, regardless of whether those reasons were correct (and I continue to maintain they were not), robing the majority opinion in the mantle of judicial restraint does not alter the undisputed fact that no party to that case argued equal protection "as applied" to the District Court or to this Court on appeal, nor did the trial court rule on that basis--and, in my view, for good reason. *Roosevelt*, ¶¶ 77-78 (Nelson, J., dissenting).

¶74. While Justice Gray and I can agree to disagree on the rationale for deciding *Roosevelt,* I cannot understand the logic underpinning her willingness to wink at the rule in a tax case raising an equal protection issue involving the lowest level of judicial scrutiny, but, here, in a case where the legal precedents at issue are concededly in error, she finds it is acceptable-- even requires--that the accused's *fundamental* constitutional right to be free from unreasonable searches and seizures be sacrificed on the altar of a convention of appellate practice. In my view, at least, the substance of the law demands more.

¶75. That aside, there is ample justification in the case *sub judice* for our not following the general principles cited by Justice Gray. Obviously, it is always preferable that the theories and arguments on which cases are decided be advanced by the parties and raised in the trial court. This is particularly true where there is no precedent addressing the legal argument or theory on which we seek to decide the case. However, when this Court once decides a case based upon an erroneous articulation and adoption of a principle or theory of law--as we did in *Sykes*--and when we then reaffirm that error in subsequent cases--as we did in *Mosley* and *Feland*--there is little likelihood the practicing bar will challenge the erroneous theory or principle or that a trial court will simply ignore the offending precedent.

¶76. Justice Gray believes that the solution is simply to "sow the seeds" of change in a dissent or concurrence. For the most part, I agree, and, as it did in the two cases she cites, often that works. The case at bar, however, proves the necessity for the occasional exception to this approach.

¶77. As the majority opinion points out, we adopted the *Franks* procedure in *Sykes*. In *Mosley,* Justice Trieweiler "sowed the seeds" of change in his special concurrence and dissent by pointing out the error of following *Franks* and suggesting an alternate approach. Justice Gray joined Justice Trieweiler's separate opinion. The seeds sown by Justice Trieweiler fell on barren ground, however. In *Feland*, an opinion authored by Justice Gray for a majority which included this writer, we ignored Justice Trieweiler's invitation in *Mosley* to modify and correct our prior two precedents. Justice Trieweiler again wrote separately.

¶78. While, admittedly, my experience in agriculture is limited, I do know enough to recognize that when you twice experience crop failure, sowing seed for a third time in the same field is not likely to produce a bountiful harvest. The same is true in the law. When "sowing the seed" of change fails to produce the crop of new arguments hoped for, it is more judicious to simply abandon the unproductive field for more fertile soil. It accomplishes nothing to continue to plow the same barren ground. Worse, doing so simply adds layers of supportive precedent to the lineage of an erroneous decision and increases the reluctance to and difficulty in setting straight the law.

¶79. Moreover, to expect that "sowing the seeds" of change in a separate opinion will encourage the bench and bar to challenge mounting precedent which rejects the

suggested alternate approach, exemplifies the triumph of hope over experience. In fact, there is a real disincentive for challenging clear authority articulated in a recently decided line of cases where the challenge is based upon an approach and theory previously set out in separate

opinions at least twice rejected by a majority of the Court. The downside of challenging the law under such circumstances is that lawyers may subject themselves to Rule 11, M.R.Civ.P., and Rule 32, M.R.App.P., sanctions and the trial court risks almost certain reversal. While Justice Gray would minimize this risk, I suggest that the practitioner may not be so quickly willing to risk his or her credibility--and pocketbook--on what might well be deemed a bad faith argument or frivolous appeal. Nor is it likely that the trial judge will be anxious to go out on a limb knowing that we will almost certainly saw it off behind him or her because of *stare decisis*.

¶80. Justice Gray correctly notes that in *Feland* no party asked us to correct the error discussed in the *Mosley* dissent. And that is exactly my point. In *Mosley* the error was raised --i.e, the seeds were sown. The defense did not argue the *Mosley* dissent in *Feland*, however. Again Justice Trieweiler raised the error in a separate opinion. *Feland*, 267 Mont. at 116-18, 882 P.2d at 502-03. Nevertheless, honoring the doctrine of *stare decisis*, we dutifully followed our prior precedent, *Sykes* and *Mosley*. *Feland*, 267 Mont. at 115, 882 P.2d at 501-02. Now, in the case at bar, we are faced with this situation for a third time. Does some member of the Court write yet another dissent in the hope that the fourth--or fifth, or sixth . . . or tenth case--may be the charm? Or do we exercise *our* fundamental obligation to determine and articulate a correct statement of the law *regardless* of whether the practicing bar "perceives" the problem, as suggested by Justice Gray, or, more likely, whether the attorneys simply choose to ignore the issue because we have twice rejected the argument that would have to be made?

¶81. Purely and simply, there comes a point, as in the case at bar and in *Craig v. Schell*, 1999 MT 40, ___ P.2d ___, 56 St.Rep. 167, to which Justice Gray alludes, where principles of *stare decisis* do not justify compounding the error in the hope that some attorney or some trial court will have the moral fortitude to raise the challenge in a future case. *Stare decisis* is a fundamental doctrine which reflects our concerns for stability, predictability and equal treatment. *Formicove, Inc. v. Burlington Northern, Inc.* (1983), 207 Mont. 189, 194, 673 P.2d 469, 472. Justice Gray's opinion to the contrary, no member of the Court who has signed the majority

**opinion here has "cavalierly" ignored this important doctrine. However,**

[c]ourt decisions are not sacrosanct . . . and *stare decisis* is "not a mechanical formula of adherence to the latest decision." Indeed, we have held that *stare decisis* does not require us to follow a manifestly wrong decision.

*State v. Gatts* (1996), 279 Mont. 42, 51, 928 P.2d 114, 119 (citations omitted).

**¶82.** *Sykes, Mosley* **and** *Feland* **were wrong. Even the dissent acknowledges that. It is time these decisions were taken off life support.**

/S/ JAMES C. NELSON

Chief Justice J. A. Turnage specially concurring:

¶83 I specially concur in this Court's order of remand to the District Court to conduct a *de novo* hearing on Worrall's motion to suppress. I do not agree with all of the analysis and what is said in the majority opinion.

¶84 In my view, for the purpose of establishing a valid search warrant application, the information provided by eleven-year-old Erik Cranmore was more than sufficient to support probable cause for the issuance of the warrant. This Court has approved the testimony in criminal cases of children much younger than Erik and has affirmed convictions for serious felonies based on the testimony of a child witness.

/S/ J. A. TURNAGE