DA 07-0700

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 64

DAVID WILLIAM BROWN,

      Petitioner and Appellant,

v.

STATE OF MONTANA,

      Respondent and Appellee.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Hill, Cause No. DV 2007-169
Honorable John C. McKeon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jeremy S. Yellin, Attorney at Law, Havre, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General, C. Mark Fowler,
Assistant Attorney General, Helena, Montana

          Cyndee L. Peterson, Hill County Attorney, Lindsay Osborne, Deputy
County Attorney, Havre, Montana

Submitted on Briefs:  December 10, 2008

Decided:  March 3, 2009

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 David Brown appeals an order of the District Court for the Twelfth Judicial District, Hill County, denying the reinstatement of his drivers' license following Brown's refusal to submit to testing under Montana's implied consent law. We affirm.

¶2 We address the following issue on appeal: Whether the District Court erred in determining that the arresting officer had reasonable grounds to believe that Brown was driving under the influence of alcohol.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 At approximately 2:51 a.m. on June 10, 2007, Hill County Deputy Sheriff Stephen Martin observed a white Ford pickup "barely moving" along a public roadway with its lights on. As Deputy Martin watched, the pickup suddenly pulled over, came to a stop and shut off its lights. Concerned that the occupants of the pickup were experiencing problems, Martin pulled in behind it, exited his vehicle and approached the driver's side of the pickup.[1]

¶4 Brown, who was in the drivers' seat, was the only person in the pickup. Deputy Martin noted that no structures or other persons were in the immediate vicinity. When Brown rolled down his window, Deputy Martin immediately detected the odor of alcohol. Deputy Martin asked Brown if he was having any problems and Brown responded that he

---

[1] In the District Court hearing on Brown's Petition for Reinstatement of Driver's License, one of the arguments the State made in closing was that the Community Caretaker Doctrine applied in this case. However, in its order denying Brown's petition, the court simply stated that Deputy Martin "had probable cause/reasonable grounds to believe Brown was committing or had committed" the offense of DUI. The court did not mention the Community Caretaker Doctrine in its order and the State did not pursue that argument on appeal.

and his son just had an argument which caused his son to get out of the vehicle and walk away. Brown, who admitted that he had been drinking, explained that he had pulled over to wait for his son to return.

¶5 Deputy Martin observed a plastic Budweiser container in the cupholder on the dashboard of the pickup. He also observed that Brown's speech was slow and that he slurred his words. Based on these observations, Deputy Martin asked Brown to exit the pickup so that he could perform some field sobriety tests. Brown was slow in exiting the pickup and, at one point, he had to lean on the side of the truck for assistance. Brown explained that he had back problems.

¶6 Deputy Martin administered the horizontal gaze nystagmus (HGN) test. However, he did not properly administer the test and, as the District Court pointed out in its Order on Petition to Challenge License Suspension, the validity of the HGN test was compromised. Deputy Martin asked Brown to take a breath test, but Brown refused. Deputy Martin arrested Brown for Driving Under the Influence of Alcohol (DUI) and transported him to the detention center in Havre. At the detention center, Deputy Martin again administered the HGN test, but this test was compromised in the same manner as the first HGN test. Deputy Martin then read Brown the Implied Consent Advisory and asked Brown to submit to a breath test. Again Brown refused, thus his driver's license was suspended pursuant to § 61-8-402(4), MCA.

¶7 Brown filed a petition to have his driver's license reinstated on July 6, 2007. In his petition he argued that because Deputy Martin did not have reasonable grounds to believe that Brown was under the influence of alcohol, the arrest was illegal. After a

3

hearing, the District Court denied Brown's petition by order dated October 28, 2007. Brown appeals the District Court's denial of his petition for reinstatement. The District Court subsequently granted Brown's motion to stay the suspension of his driver's license pending appeal.

## STANDARD OF REVIEW

¶8 We review a district court's ruling on a petition to reinstate a driver's license to determine whether the district court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *Clark v. State, ex rel., Driver Imp. Bureau*, 2005 MT 65, ¶ 6, 326 Mont. 278, 109 P.3d 244. Because the suspension of a driver's license is presumed to be correct, the petitioner bears the burden of proving that the State's action was improper. *Brewer v. State*, 2004 MT 193, ¶ 5, 322 Mont. 225, 95 P.3d 163 (citing *Widdicombe v. State ex rel. Lafond*, 2004 MT 49, ¶ 7, 320 Mont. 133, 85 P.3d 1271).

## DISCUSSION

¶9 ***Whether the District Court erred in determining that the arresting officer had reasonable grounds to believe that Brown was driving under the influence of alcohol.***

¶10 Brown contends on appeal that Deputy Martin did not have reasonable grounds to believe that Brown was driving under the influence of alcohol, thus there was no basis to require Brown to provide a breath sample. In making this argument, Brown contends that based upon the "plain, unmistakable language" in this Court's decision in *State v. Gopher*, 193 Mont. 189, 631 P.2d 293 (1981), only an "experienced" officer can make the proper inferences regarding a DUI. In this case, Brown contends that Deputy Martin was lacking the requisite experience because he had conducted only four prior DUI

4

investigations and he had been on the job for less than one year. Brown also contends that there was not sufficient objective data from which inferences of DUI could be drawn. Thus, Brown maintains that he was illegally seized by an inexperienced deputy who relied upon subjective information to justify his illegal actions.

¶11 In a driver's license reinstatement proceeding, the court is limited to deciding whether:

> (i) a peace officer had *reasonable grounds* to believe that the person had been driving or was in actual physical control of a vehicle upon ways of this state open to the public while under the influence of alcohol, drugs, or a combination of the two and the person was placed under arrest for violation of 61-8-401;
>
> .  .  .
>
> (iv) the person refused to submit to one or more tests designated by the officer.

Section 61-8-403(4)(a) (emphasis added). This Court has repeatedly held that the "reasonable grounds" requirement in § 61-8-403(4)(a), MCA, is the equivalent of a "particularized suspicion" to make an investigative stop as set forth in § 46-5-401, MCA. *Brewer*, ¶ 9 (citing *Anderson v. State Dept. of Justice*, 275 Mont. 259, 263, 912 P.2d 212, 214 (1996)). Section 46-5-401, MCA, Montana's investigative stop and frisk statute, provides, in pertinent part:

> **Investigative stop and frisk.** (1) In order to obtain or verify an account of the person's presence or conduct or to determine whether to arrest the person, a peace officer may stop any person or vehicle that is observed in circumstances that create a *particularized suspicion* that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense. [Emphasis added.]

5

¶12   Neither § 61-8-403, MCA, nor § 46-5-401, MCA, have ever required that an officer have a specific amount of training or experience.   These statutes have always simply referred to a "peace officer," which is defined in § 46-1-202(17), MCA, as

> any person who by virtue of the person's office or public employment is vested by law with a duty to maintain public order and make arrests for offenses while acting within the scope of the person's authority.

The idea that an officer has to have a certain amount of experience in order to make an investigatory stop and frisk comes from this Court's early interpretations, or misinterpretations, of the United States Supreme Court's decision in *United States v. Cortez*, 449 U.S. 411, 101 S. Ct. 690 (1981).

¶13   In *Cortez*, border patrol officers stopped the defendant's vehicle after the officers deduced from various observations they had made over a period of time that the defendant was transporting illegal aliens.  Prior to trial, the defendant sought to suppress evidence of the illegal aliens found in his vehicle contending that the officers did not have adequate cause to make the investigative stop.  *Cortez*, 449 U.S. at 411, 101 S. Ct. at 691-92.  The Supreme Court set forth the following two-part test to determine whether the stop was proper:

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible.  First, the assessment must be based upon all the circumstances.  The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers.  From these data, *a trained officer* draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>     . . . Finally, the evidence thus collected must be seen and weighed, not in terms of library analysis by scholars, but as understood by *those*

6

*versed in the field of law enforcement.*

The second element . . . is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Cortez*, 449 U.S. at 418, 101 S. Ct. at 695 (emphasis added).

¶14   While the Supreme Court referred several times in *Cortez* to "trained" officers, it only once referred to "experienced" officers and then it did so in the context of what an "experienced" officer might infer.   The Supreme Court did not establish in *Cortez* any requirement that only "experienced" officers could make such inferences.

[T]he test is not whether [the officers] had probable cause to conclude that the vehicle they stopped would contain [the suspect] and a group of illegal aliens.   Rather the question is whether, based upon the whole picture, they, as *experienced* Border Patrol officers, could reasonably surmise that the particular vehicle they stopped was engaged in criminal activity.

*Cortez*, 449 U.S. at 421-22, 101 S. Ct. at 697 (emphasis added).

¶15   A few months after the Supreme Court's decision in *Cortez*, this Court decided *State v. Gopher*, 193 Mont. 189, 194, 631 P.2d 293, 296 (1981), wherein it discarded the dictum in *State v. Rader*, 177 Mont. 252, 581 P.2d 437 (1978), regarding probable cause and adopted the particularized suspicion test for an investigatory stop found in *Cortez*. This Court noted the following in *Gopher* regarding the officer who made the investigatory stop in that case:

It should be noted here that Officer Johnston is an *experienced and knowledgeable member* of the Great Falls police department, having been with the force for over twelve years.   This is an important element of the *Cortez* analysis, which emphasizes that *experienced law enforcement authorities* are allowed to draw certain conclusions which laymen could not properly draw in determining if a specific vehicular stop is legally valid. . . .

. . .

7

. . . These known facts, combined with the deductions made in light of *twelve years' experience in crime investigation*, led Officer Johnston to suspect defendant was involved in, or witness to, the crime.

*Gopher*, 193 Mont. at 192-94, 631 P.2d at 295-96 (emphasis added).

¶16   Although this Court referred several times throughout *Gopher* to an "experienced" officer, in reaching our holding in this case, we referred simply to a "trained" officer:

In light of the *Cortez* decision, and other persuasive authority, we now hold that when *a trained police officer* has a particularized suspicion that the occupant of a vehicle is or has been engaged in criminal activity, or witness thereto, a limited and reasonable investigatory stop and search is justified.

*Gopher*, 193 Mont. at 194, 631 P.2d at 296 (emphasis added).

¶17   Shortly after *Gopher* was decided, this Court decided *State v. Schatz*, 194 Mont. 59, 634 P.2d 1193 (1981), wherein we acknowledged that *Gopher* adopted the two-part particularized suspicion test from *Cortez*.  In applying the facts in *Schatz* to that test, we pointed out that the officer involved in *Schatz* was "a veteran of 9 years of *experience*," and we concluded that "[u]nder the test adopted in [*Gopher*], this *experienced* law enforcement officer had a 'particularized suspicion' sufficient to effectuate a lawful arrest." *Schatz*, 194 Mont. at 62, 634 P.2d at 1195 (emphasis added).

¶18   The following year, this Court stretched the use of the term "experienced" officer even further in *State v. Morsette*, 201 Mont. 233, 240, 654 P.2d 503, 507 (1982).  In *Morsette*, the defendants contended that the investigatory stop in that case was improper and unjustified because the deputy making the stop was unqualified as a trained law enforcement officer.  The District Court, and subsequently this Court, compounded the

8

problem by specifically looking at the amount of the officer's training and experience in analyzing this issue.

> At the time in question, Deputy Sheriff O'Loughlin had been a law enforcement officer for over 2 ½ years. His experience with burglary investigations was limited, but he had worked several burglary cases. He had taken the basic training course of six weeks at the Montana Law Enforcement Academy, which included instruction on investigations and basic rules of evidence. While he might have been a comparative beginner in the law enforcement field, he sufficiently qualified as a trained police officer.

*Morsette*, 201 Mont. at 237, 654 P.2d at 505.

¶19 Hence, the requirement that an officer making an investigative stop has to have a specific amount of experience to form a particularized suspicion, evolved from various early misinterpretations of the Supreme Court's decision in *Cortez*. However, there is no statute in Montana that implicitly or explicitly carves out a class of Montana peace officers as the only officers capable of rendering observations and decisions to form particularized suspicion for an investigatory stop. Rather than requiring that *each* officer making an investigative stop have a certain amount of experience, the test for particularized suspicion simply requires that the information available to the investigating officer—whether a rookie or a veteran—be sufficient to allow a hypothetical "experienced" officer to have either particularized suspicion for a stop, or probable cause for an arrest.

¶20 Therefore, we hold that, henceforth, for a peace officer to have particularized suspicion or reasonable grounds for an investigatory stop, the peace officer must be possessed of: (1) objective data and articulable facts from which he or she can make

9

certain reasonable inferences; and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense. While a peace officer's experience and training may be a factor in determining what sort of reasonable inferences he or she is entitled to make from his or her objective observations, experience and training will not necessarily be the defining element of the test. For example, a rookie peace officer on his or her first patrol may well be entitled to make an investigatory stop of a vehicle at 2:00 a.m. that is driving slowly, without lights, and is weaving across the center line and fog lines. That same peace officer, however, might not be entitled to make reasonable inferences resulting in particularized suspicion or reasonable grounds to stop under circumstances which are demonstrably beyond his or her training or experience. The courts will look to the facts and to the totality of the circumstances of each case.

¶21 In the instant case, Brown contends that "virtually all" of the data that Deputy Martin utilized to make his inferences of wrongdoing were subjective. Brown maintains that observations such as the odor of alcohol, the early morning hour, the slow movement of the vehicle, the sudden stop, the slurred and slow speech, the slow and staggered exit from the vehicle, and the explanation of a recently absent passenger when no other person was in the immediate vicinity, were observations that were subjective, not objective. Brown claims that the only objective data from which Deputy Martin could make any inferences of wrongdoing was Brown's turning off the pickup's lights, admitting that he had been drinking, and the plastic Budweiser container in the pickup's

cupholder. Brown further claims that because there was nothing improper about the way his pickup was parked, there was no objective evidence of any illegal activity.

¶22 Whether a particularized suspicion exists is a question of fact determined by examining the totality of the circumstances. *Brewer*, ¶ 9 (citing *Anderson*, 275 Mont. at 263, 912 P.2d at 214). Here, Deputy Martin did not act upon one isolated observation but drew inferences from several observations that, when considered together, indicated possible criminal activity.

> "[T]he question is not whether any one of [defendant's] driving aberrations was itself 'illegal' but rather, whether [the officer] could point to specific and articulable facts which, taken together with reasonable inferences from those facts, reasonably warrant the intrusion."

*Clark v. State, ex rel., Driver Imp. Bureau*, 2005 MT 65, ¶ 9, 326 Mont. 278, 109 P.3d 244 (quoting *State v. Brander*, 2004 MT 150, ¶ 6, 321 Mont. 484, 92 P.3d 1173).

¶23 In this case, Deputy Martin was possessed of objective data and articulable facts that Brown's vehicle was "barely moving" along a public roadway at 2:51 a.m. with its lights on and that it suddenly pulled over, came to a stop, and shut off its lights. Given that this sort of conduct can be indicative of intoxicated driving, Deputy Martin could reasonably suspect that the driver of the vehicle was operating the vehicle while under the influence of alcohol or drugs in violation of § 61-8-401, MCA. On approaching the vehicle, Deputy Martin observed the odor of alcohol from Brown's vehicle, Brown's slurred and slow speech, slow and staggered exit from the vehicle, and explanation of a recently absent passenger when no other person was in the vicinity. These were objective observations which allowed Deputy Martin's particularized suspicion to escalate into

11

probable cause for a DUI arrest. *See Hulse v. State, Dept. of Justice,* 1998 MT 108, 289 Mont. 1, 961 P.2d 75.

¶24     Accordingly, we hold that the District Court was correct in concluding that Deputy Martin had reasonable grounds to believe that Brown was driving under the influence of alcohol.

¶25     Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ BRIAN MORRIS