DA 08-0371

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 179

STATE OF MONTANA,

      Plaintiff and Appellee,

v.

TODD DEINES,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Dawson, Cause No. DC-08-006
Honorable Richard A. Simonton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Jim Wheelis, Chief Appellate Defender; Kelli S. Sather, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Hon. Steve Bullock, Montana Attorney General; Tammy Plubell,
Assistant Attorney General, Helena, Montana

          Scott Herring, Dawson County Attorney, Glendive, Montana

                  Submitted on Briefs:  March 25, 2009

                               Decided:  May 19, 2009

Filed:

             _____
                         Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Todd Deines (Deines) appeals an order of the Seventh Judicial District Court, Dawson County, denying his motion to suppress evidence of driving under the influence of alcohol (DUI).  We affirm.

¶2     The procedural issue on appeal is whether the District Court correctly denied Deines' motion to suppress evidence of driving under the influence of alcohol obtained after Montana Highway Patrol Trooper Michael Briggs (Briggs) stopped Deines for running two red lights.  Deines argues that the District Court "misapprehended the effect of the evidence before it" and that this Court should extend a line of cases that "view with distrust" the failure of law enforcement officers to preserve a record of particular evidentiary matters.  Thus, the relevant legal issue presented in this appeal is whether the failure of a police officer to record events creating particularized suspicion for a traffic stop should be viewed with distrust in the judicial assessment of particularized suspicion, when the means to record events are readily available to the officer.

**BACKGROUND**

¶3     At about 10:38 p.m. on November 24, 2007, Trooper Briggs was waiting in his patrol car at the intersection of Towne Street and Meade Avenue in Glendive for the traffic light to turn green so he could turn left and travel northwest on Towne Street.  The light turned green, Briggs turned left, and after traveling a short distance, he noticed Deines' truck traveling in the opposite direction on Towne Street.  Briggs testified that he watched Deines' truck drive through a red light at Towne and Meade in his driver's side

2

rearview mirror. Briggs made a U-turn to follow Deines' truck and observed Deines run another red light on Towne and Kendrick. Briggs turned on his overhead lights to initiate a traffic stop after Deines stopped for a red light at Towne and Merrill. Briggs' patrol car was equipped with a video camera that was activated automatically when the overhead lights were engaged.

¶4 When Briggs commented that Deines had run two red lights, Deines insisted that the lights were in fact green. Briggs asked Deines' girlfriend, who was also in the truck, whether she noticed that the lights were red. She responded that she did not because she was looking down at her purse. As a result of the traffic stop, Briggs arrested Deines for DUI. Prior to conducting field sobriety tests, Deines told Briggs, "I'm sorry what I did at those stoplights." Deines' preliminary breath test revealed a .132 blood alcohol content (BAC).

¶5 Deines was charged with first offense DUI in violation of § 61-8-401, MCA. Deines filed a motion to suppress evidence gathered after the traffic stop, which was denied in justice court. Deines entered a plea bargain agreement with the State, pled nolo contendere to an amended charge of operating a motor vehicle with BAC of .08 or greater, in violation of § 61-8-406, MCA, reserving the right to appeal the denial of his motion to suppress, and was sentenced on March 7, 2008, in justice court. Deines appealed to the District Court on March 14, 2008. On April 30, 2008, Deines filed a motion to suppress all evidence gathered during the traffic stop on the grounds that Briggs lacked particularized suspicion for the stop. The District Court held a hearing on the motion on June 10, 2008, and denied the motion on June 12. Deines pled nolo

3

contendere and reserved his right to appeal the denial of his motion to suppress all evidence for lack of particularized suspicion. Deines now appeals the denial of his motion to suppress.

## STANDARD OF REVIEW

¶6 We review a district court's decision to grant or deny a motion to suppress to determine whether the court's underlying findings of fact are clearly erroneous and whether the court correctly interpreted and applied the law to those findings. *State v. Gittens*, 2008 MT 55, ¶ 9, 341 Mont. 450, 178 P.3d 91. "A trial court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the court has misapprehended the effect of the evidence, or if our review of the record leaves us with a definite and firm conviction that a mistake has been made." *State v. Lewis*, 2007 MT 295, ¶ 17, 340 Mont. 10, 171 P.3d 731.

## DISCUSSION

¶7 *Whether the failure of a police officer to record events creating particularized suspicion for a traffic stop should be viewed with distrust in the judicial assessment of particularized suspicion, when the means to record events are readily available to the officer.*

¶8 Montana law provides that "a peace officer may stop any person or vehicle that is observed in circumstances that create a particularized suspicion that the person or occupant of the vehicle has committed, is committing, or is about to commit an offense." Section 46-5-401(1), MCA. The State must prove that an officer had particularized suspicion to stop a vehicle by showing: (1) objective data and articulable facts from

4

which an officer can make certain reasonable inferences; and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense. *Brown v. State*, 2009 MT 64, ¶ 20, 349 Mont. 408, 203 P.3d 842; *State v. Gopher*, 193 Mont. 189, 194, 631 P.2d 293, 296 (1981). Whether particularized suspicion exists is a question of fact that depends on the totality of the circumstances. *State v. Waite*, 2006 MT 216, ¶ 11, 333 Mont. 365, 143 P.3d 116.

¶9     The District Court found that "patrolman Briggs' observation of the Defendant's vehicle from his outside mirror going through a red light and his observation of the Defendant immediately in front of him driving through a second red light is particularized suspicion that justified the officer's stop of the Defendant's vehicle."

¶10     Deines argues that the District Court's finding that Briggs had particularized suspicion is clearly erroneous because the court misapprehended the effect of Briggs' testimony by failing to consider that Briggs did not record Deines running the second red light when the means to do so was readily available. Deines argues that this Court should extend a line of cases that advise Montana courts to "view with distrust" the failure of law enforcement to preserve a record of particular evidentiary matters.

¶11     This Court first articulated this "viewed with distrust" approach in *State v. Grey*, in the context of a police officer's failure to record Miranda warnings advising a suspect of his rights. 274 Mont. 206, 214, 907 P.2d 951, 956 (1995). In *Grey*, the police used impermissible procedures and tactics, including making false statements, in order to obtain Grey's confession to thefts at the store where he worked. 274 Mont. at 212, 907 P.2d at 955. While not holding that police *must* create a record of giving Miranda

5

warnings and a detainee's waiver of rights, the Court advised, "that may be the better practice." *Grey*, 274 Mont. at 213, 907 P.2d at 955.

> We do hold, that, in the context of a custodial interrogation conducted at the station house or under other similarly controlled circumstances, the failure of the police officer to preserve some tangible record of his or her giving of the *Miranda* warning and the knowing, intelligent waiver by the detainee will be viewed with distrust in the judicial assessment of voluntariness under the totality of circumstances surrounding the confession or admission.

*Grey*, 274 Mont. at 214, 907 P.2d at 956.

¶12 The Court has reaffirmed this holding in the context of Miranda warnings, while also distinguishing facts, to conclude that a defendant voluntarily waived his rights despite police failures to record Miranda warnings and waivers. In *State v. Cassell*, the Court held that evidence supported a determination that the defendant voluntarily waived his rights and confessed, notwithstanding the failure of police to record the warnings and waiver. 280 Mont. 397, 403, 932 P.2d 478, 481 (1996). The Court noted that the defendant was 43 years old and had a lengthy police record, which made him familiar with the criminal justice system and police interrogation methods. *Cassell*, 280 Mont. at 403, 932 P.2d at 481. The Court further reasoned that none of the interrogations was overly long, and no threats were made. *Cassell*, 280 Mont. at 403, 932 P.2d at 481. In *State v. Lawrence*, the Court held that police officers' failure to tape record Miranda warnings and waiver did not vitiate other evidence supporting the conclusion that the defendant voluntarily waived his rights. 285 Mont. 140, 155-56, 948 P.2d 186, 195 (1997). The Court concluded that the evidence indicated that the defendant was repeatedly advised of his Miranda rights, was familiar with Miranda, the criminal justice

system, and police interrogations from prior arrests and from television. *Lawrence*, 285 Mont. at 153, 948 P.2d at 194. Furthermore, the defendant testified that he understood his rights, verbally agreed to speak with officers without an attorney, and signed a voluntary waiver of rights form. *Lawrence*, 285 Mont. at 153, 948 P.2d at 194. Finally, in *State v. Gittens*, the Court determined that the State met its burden to prove that the defendant was advised of his Miranda rights and that the defendant voluntarily, knowingly, and intelligently waived them. *Gittens*, ¶ 29. The Court made this ruling even though there was no tangible record of the deputy reading Miranda warnings or of the defendant's subsequent waiver. *Gittens*, ¶ 29. A deputy testified that he read Miranda rights to the defendant from a printed card, asked the defendant whether he understood those rights, and that the defendant replied that he did. *Gittens*, ¶¶ 23-24. A second deputy confirmed the first deputy's version of events and both deputies testified that defendant made an express, verbal waiver of his rights. *Gittens*, ¶¶ 25-26.

¶13 The Court revisited this "viewed with distrust" language in dicta in *State v. Siegal* regarding a law enforcement officer's failure to videotape the results of a thermal imaging scan used to support a search warrant application for a suspected marijuana grow operation. 281 Mont. 250, 278, 934 P.2d 176, 192-93 (1997), *overruled on other grounds*, *State v. Kuneff*, 1998 MT 287, 291 Mont. 474, 970 P.2d 556 (1998). After deciding to reverse the defendant's conviction on other grounds, the Court's opinion stated:

> In light of our decision to reverse the District Court on the motion to suppress, we need not decide this issue. However, since this is a case of first impression in Montana, we offer the following for future guidance to

the courts.  As with our decision in *State v. Grey* (1995), 274 Mont. 206, 907 P.2d 951, regarding audio and/or video recordings of Miranda warnings and a detainee's waiver of the same, we do not require that law enforcement officers must, as a matter of law, create a video recording of the results of a thermal imaging scan.  We do, however, note that, absent the demonstration of a legitimate and compelling reason to the contrary, the failure of law enforcement officers to preserve some tangible record of the results of a thermal imaging scan should be viewed with distrust in the judicial assessment of the interpretation of those results.  See *Grey*, 907 P.2d at 956.

*Siegal*, 281 Mont. at 278, 934 P.2d at 192-93.

¶14     In *State v. Weaver*, this Court extended its "views with distrust" discussion to a detective's failure to preserve a record of interviews with child sexual abuse victims. 1998 MT 167, ¶ 53, 290 Mont. 58, 964 P.2d 713.  Drawing on *Grey*, the Court reasoned that:

> the failure of the investigating officer in child sexual abuse cases to preserve some tangible record of the interview, in a controlled situation and absent exigent circumstances, will be viewed with distrust in the judicial assessment of the veracity of the child victims' statements.  This is all the more so where the evidence demonstrates that, as in the case before us, the investigating officer made a conscious decision not to videotape or audiotape the interviews or to preserve any other kind of record of the interviews.

*Weaver*, ¶ 53.

¶15     Finally, in *State v. Worrall*, the Court extended its "views with distrust" precedent to the failure of law enforcement officers to record a citizen informant's statements in the controlled environment of a station house.  1999 MT 55, ¶ 54, 293 Mont. 439, 976 P.2d 968.  In *Worrall*, two young boys reported to a sheriff's deputy that they had observed marijuana plants growing on Worrall's property.  ¶¶ 7-9.  The Court held that the

8

deputy's failure to record the interview should be "viewed with distrust" in assessing the truthfulness of the State's declarations in its search warrant application:

> we hold that, absent the demonstration of exigent circumstances or some other compelling reason, the failure of the investigating officer to preserve some tangible record of the citizen informant's statements made in the controlled environment of the station house, will be viewed with distrust in the judicial assessment of the truthfulness of the state's declarations made in the search warrant application to the extent those declarations are based on the citizen informant's statements.

*Worrall*, ¶ 55.

¶16    We decline to extend this "viewed with distrust" precedent to the facts in this case. *Grey*, *Cassell*, *Lawrence*, and *Gittens* all concern the unique circumstances requiring Miranda warnings. The U.S. Supreme Court required Miranda warnings in order to protect a detainee's constitutional privilege against self-incrimination from the "inherent coercion" of custodial interrogation:

> The current practice of incommunicado interrogation is at odds with one of our Nation's most cherished principles—that the individual may not be compelled to incriminate himself. Unless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.

*Miranda v. Arizona*, 384 U.S. 436, 457-58, 86 S. Ct. 1602, 1619 (1966). Deines was not subjected to custodial interrogation without the benefit of Miranda warnings as a result of the traffic stop. *Weaver* and *Worrall*, while not involving suspect interrogations, both concern witness interviews conducted in a "controlled environment."

¶17    This line of "viewed with distrust" cases mostly relate to police officers gathering evidence in the controlled environment of a police station. This Court has explicitly

9

recognized that circumstances, such as Mirandizing a suspect in the field at the time of arrest, may preclude the creation of a tangible record. *Gittens*, ¶ 20. Although Briggs' patrol car was equipped with a video camera, Briggs was not interviewing a suspect at the police station, and there is no allegation that Deines' privilege against self-incrimination was infringed due to a failure to receive Miranda warnings in the face of the inherent coercion of custodial interrogation.

¶18 *Siegal* presents the closest factual circumstances to the case at bar. *Siegal* is the rare "viewed with distrust" case involving an investigation outside of the police station. However, this "viewed with distrust" discussion is not binding. The *Siegal* opinion specifically prefaced the analysis quoted above as "future guidance to the courts," which went well beyond the holding of the case. Consequently, the Court's discussion in dicta, that the officer's failure to videotape the gathering of thermal imaging evidence would be viewed with distrust in the judicial assessment of the interpretation of those results, proves of questionable validity. The holding in *Grey* should not be applied to facts that do not arise within the "controlled environment" of a law enforcement facility. Such interrogations involve special constitutional guarantees that have been articulated for many years by appellate courts throughout the United States (*Miranda* et al.).

¶19 Moreover, the legislature's recent adoption of HB 534, "An Act Requiring the Electronic Recording of Custodial Interrogations in Felony Cases and in Youth Court Cases Involving an Offense That Would Be a Felony if Committed by an Adult," essentially renders *Grey* and its progeny moot. 2009 Mont. Chap. 214 (signed April 15, 2009; effective Oct. 1, 2009) (available at Montana Legislature 2009 Bills,

http://leg.mt.gov/css/default.asp).  Consequently, future application of this "viewed with distrust" precedent is doubtful.

¶20     To view a sworn police officer's statements that he observed actions contributing to particularized suspicion with distrust merely because he failed to videotape his observations in the field would stretch our long-established jurisprudence well beyond constitutional necessity and reason.  Deines presents no justification for questioning the District Court's factual determination.   This Court has long adhered to the well-established rule that factual determinations are within the purview of the trial courts.

> It is not this Court's function, on appeal, to reweigh conflicting evidence or substitute our evaluation of the evidence for that of the district court.  We defer to the district court in cases involving conflicting testimony because we recognize that the court had the benefit of observing the demeanor of witnesses and rendering a determination of the credibility of those witnesses.

*Gittens*, ¶ 27 (citation omitted).  To single out a particular class of witness and suggest that their testimony should be viewed with distrust is a considerable departure from well-established precedent and a significant erosion of the role of the trier of fact.  The District Court weighed the conflicting testimony of Officer Briggs and Deines and determined that Officer Briggs' account was more credible.  Deines has not convinced us that the District Court's findings of fact were clearly erroneous.

¶21     In addition, Deines provides no reason to believe that videotaping the events preceding the traffic stop would have done anything but further corroborate Officer Briggs' testimony.  Briggs was not required to take initiative to procure video evidence that Deines alleges would assist his defense.  Deines' suggestion that Briggs' failure to

11

videotape him running a second red light amounts to destruction of exculpatory evidence is not supported by our caselaw or the facts. *Weaver*, ¶ 54. Briggs could have particularized suspicion for the stop based solely on his personal observations.

¶22 *Grey* and its progeny created a cohort of witnesses singled out to "view with distrust" in particular circumstances. The implications of this suggestion of distrust have become increasingly difficult to reconcile with our jurisprudence, as recently indicated in *Gittens*:

> This presumption of distrust flies in the face of the district court's credibility and discretionary functions and the law's requirement that the totality of the circumstances be considered. It further results in the backpedaling distinguishing of that holding which is required in this opinion, and, not least of all, a negative pre-judging of the testimony of a sworn police officer.

*Gittens*, ¶ 46 (Rice, J., concurring).

¶23 We conclude that there is no reason to view with distrust the failure of a police officer to record events creating particularized suspicion for a traffic stop. The District Court's finding that Officer Briggs had particularized suspicion to stop Deines was not clearly erroneous and the denial of Deines' motion to suppress was correct.

¶24 Affirmed.

/S/ MIKE McGRATH

We concur:

/S/ JOHN WARNER
/S/ PATRICIA COTTER
/S/ JIM RICE

Justice James C. Nelson concurs.

¶25 I concur, for the most part, in the Court's Opinion. I agree that there is no need to extend the "view with distrust" caselaw to the circumstances here. Indeed, as the Court itself recognizes, this line of cases was intended from the beginning to encourage law enforcement to memorialize (other than in their own minds) Miranda warnings/waivers and interrogations of suspects/witnesses where those occur in the controlled environment of the station house. Opinion, ¶¶ 11, 14, 15. The fact that the Legislature has effectively codified the requirement which we suggested years ago, if anything, confirms the wisdom of our decisions. *See* Opinion, ¶ 19.

¶26 It is also important to point out, that our "view with distrust" cases were never intended to apply (nor did they, in fact, apply) to the vast majority of police Miranda warnings/waivers and suspect/witness interrogations and interviews. Most of these are conducted by peace officers whose focus is on obtaining accurate, complete factual information—be it inculpatory or exculpatory—to the end that the actually guilty person is held to account for his or her criminal conduct and can be fairly tried with all of the

13

facts available to the prosecution, defense and fact-finder. As our cases demonstrate, however, there is the occasional peace officer who is not guided by these principles. And in those instances, court involvement is necessary to protect the accused's constitutional rights and the integrity of the fact-gathering process. Quite simply, if a peace officer is not willing to memorialize his or her giving of Miranda warnings, a custodial interrogation, or the taking of a witness statement when he or she is in a controlled environment and has a recording device or paper and pencil available, then it is entirely appropriate to infer a purpose to subvert either the suspect's constitutional rights or the fact-gathering process itself. As we stated in *State v. Worrall*, 1999 MT 55, 293 Mont. 439, 976 P.2d 968:

> We doubt that there is a police station or sheriff's office in Montana that does not have paper and pens for note-taking and, more than likely, a typewriter for preparing statements, a tape recorder for recording those, and, in many cases, audio-visual recording equipment. Memorializing the reading of an accused's rights, or an accused's confession or, as in the case at bar, a citizen informant's statement in the controlled environment of the station house, absent exigent circumstances, is neither an onerous nor a high-tech enterprise. Importantly, doing so avoids the sort of "who said what to whom" challenges that require trial courts to be arbiters of the credibility disputes that are nearly always resolved against the defendant. Indeed, we cannot envision any legitimate reason why the investigating officer would not—in the ordinary case—memorialize in some fashion the taking of a witness's or informant's statement and, instead, choose to rely on his or her own memory of what was said, when the accuracy of those recollections might become critical weeks or months after the interview in proceedings implicating the fundamental rights of the defendant as well as the very ability of the state to successfully prosecute the case. No part of the criminal justice system, be it law enforcement, the prosecution, the defense, or the court, is well-served by this sort of slipshod approach.

*Worrall*, ¶ 53; *see also United States v. Foster*, 227 F.3d 1096, 1103 (9th Cir. 2000) ("We are mindful that officers are in positions of strength and superior information when

14

interacting with an accused and, therefore, that conversations occurring after a person invokes his or her *Miranda* rights must be viewed with suspicion and introduced at trial only with the utmost caution."). These observations remain true.[1]

¶27 The "view with distrust" sanction was adopted as an evidentiary test for assessing credibility, not as a law enforcement protocol. Nor, importantly, was it adopted as a comment upon peace officers' credibility generally. I believe that most peace officers will admit that there are a few bad apples in the law enforcement barrel—just as there are in every other profession. As in any profession, sanctions are adopted because of the misconduct of the few, not the many. And it follows that the majority of peace officers will never have to worry about our guideline. For the minority—few though they may be—it is appropriate that they do.

¶28 I concur.

/S/ JAMES C. NELSON

---

[1] Indeed, as to confessions and admissions, the black-letter law itself supports our caselaw. The State has the burden of proving that a confession or admission is voluntary, § 46-13-301(2), MCA, and if voluntariness is established as a matter of law, the circumstances surrounding the making of the confession or admission may be submitted to the jury as bearing on credibility or weight, § 46-13-301(3), MCA. It is questionable that any peace officer or prosecutor would choose to rely on mental recollections of an interrogation or interview months after the fact to establish the voluntariness of a confession or admission, when it was possible to simply memorialize the *Miranda* waiver and the incriminatory statements in the first place. It simply makes no sense to fight suppression battles that do not have to be fought.