# FILED

August 27 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0436

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 242

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

MARCO ANTONIO MARCIAL,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 10-361A
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wade Zolynski, Chief Appellate Defender; Koan Mercer, Assistant
Appellate Defender; Jesse Kodadek, Law Student; Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General; Tammy A. Hinderman,
Assistant Attorney General; Helena, Montana

          Greg Sullivan, Bozeman City Attorney; Susan Wordal, Assistant City
Attorney; Bozeman, Montana

                    Submitted on Briefs:  June 26, 2013

                              Decided:  August 27, 2013

Filed:

                         _____
                                  Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Marco Marcial (Marcial) pled guilty to driving under the influence (DUI) following the Bozeman Municipal Court's denial of his motion to suppress. Marcial appealed to the Eighteenth Judicial District Court, Gallatin County, which affirmed the Municipal Court's denial of Marcial's motion. We affirm the District Court's decision to deny Marcial's motion to suppress, but rely on alternate grounds.

¶2 We restate and consider the following issue:

¶3 *Whether the District Court erred by affirming the Municipal Court's denial of Marcial's motion to suppress based on the Community Caretaker Doctrine?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On May 8, 2010, at around 1:15 a.m., Bozeman Police Department Sergeant Travis Munter (Sgt. Munter) was traveling south on North Rouse Avenue in Bozeman. Sgt. Munter observed Marcial, who was driving northbound, execute a hard left turn in an area where Sgt. Munter knew there were no cross streets. Marcial drove up on the sidewalk and onto the grass before coming to an abrupt stop, nearly perpendicular to the street. Sgt. Munter then observed Marcial's vehicle back away from the curb area, where he saw a fire hydrant immediately next to the sidewalk. Concerned that Marcial had collided with the fire hydrant, Sgt. Munter turned his vehicle around and stopped behind Marcial's car just as Marcial was parking parallel to the street. Sgt. Munter activated his rear warning lights, but not his top lights.

¶5 Sgt. Munter exited his car and approached Marcial's vehicle, knocking on the side of the car. Sgt. Munter testified that he did not observe any damage to Marcial's vehicle

2

at that time and could see that the fire hydrant did not appear to be damaged. Marcial opened the door, and Sgt. Munter asked, "everything okay?" Marcial responded affirmatively. While speaking to Marcial, Sgt. Munter noticed the smell of an alcoholic beverage and other indicators that Marcial was driving under the influence of alcohol. Sgt. Munter then asked Marcial for his license and vehicle registration and proceeded with a DUI investigation. Sgt. Munter administered several standard field sobriety tests, ultimately arresting Marcial and citing him for driving under the influence in violation of § 61-8-401, MCA. Marcial was not issued any other traffic citations.

¶6 Marcial filed a motion to suppress the evidence from the stop, arguing that the community caretaker doctrine was not applicable and Sgt. Munter did not have the requisite particularized suspicion to make a traffic stop. A suppression hearing was held in Bozeman Municipal Court on November 1, 2010, with Judge Karl Seel presiding. At the hearing, Sgt. Munter said he thought Marcial "might have collided with the fire hydrant," but that he had no intent to make a traffic stop. Sgt. Munter testified that his primary concern was to "check his welfare" after seeing Marcial make the abrupt turn and sudden stop, and after observing the nearby fire hydrant. On cross examination, Sgt. Munter confirmed that he did not cite Marcial for any other traffic offense and stated "my initial contact was merely for welfare and to ascertain if there was a crash." Sgt. Munter added, "a lot of times when cars hit fire hydrants there is enough damage to report a crash." Sgt. Munter explained that while he was walking up to Marcial's vehicle, he said he didn't "see any damage on the fire hydrant" adding "those things are pretty hearty.

3

So, you want to check the vehicle, and it was a low enough vehicle, like I said, once I made sure he was okay, I could look up and see that there didn't appear to be any damage on the front of the car."

¶7 Judge Seel ruled from the bench, denying Marcial's motion to suppress. The Municipal Court orally found that the "officer turned around believing there may have been an accident," "there was a fire hydrant close to that," "the vehicle was already off the roadway at that point," and "the officer turned around . . . to see if there had been an accident to bring it within the caretaking doctrine." The Municipal Court found further that Sgt. Munter's "first statements to the defendant were asking if he was 'okay' and he got an affirmative response that he was." The Municipal Court concluded that Sgt. Munter could have made "a pretty good determination" that there had not been a collision, but he "could not know with certainty until he had . . . a good look and some conversation with defendant as to whether he had been injured because it was an abrupt stop." Denying Marcial's motion to suppress, the Municipal Court stated, "the caretaker doctrine started the stop and it ripened into a proper DUI investigation." On November 24, 2010, Marcial pled guilty to the amended charge of DUI per se subject to a plea agreement, reserving his right to appeal the denial of his motion to suppress.

¶8 Marcial appealed to the Eighteenth Judicial District Court. Judge Holly Brown reviewed the Municipal Court's decision and affirmed the denial of Marcial's motion to suppress. The District Court's Order stated:

> Sgt. Munter personally observed erratic driving behavior that caused him concern, both of a potential accident with property damage, and of a

4

possible welfare issue with the driver. Sgt. Munter was well within the parameters under *State v. Lovegren* to have "objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help." [*State v. Lovegren*, 2002 MT 153, ¶ 25, 310 Mont. 358, 51 P.3d 471.] Upon contact with Defendant, the objective observations made by Sgt. Munter supported the shift to an investigation to determine if Defendant was operating a motor vehicle while under the influence of alcohol.

The Order continued: "[t]he contact shifted to an investigation of DUI only after additional information became available to Sgt. Munter which shifted the focus from the welfare of Defendant to an investigation of Defendant."

¶9 Marcial appeals the District Court's denial of his motion to suppress.

**STANDARD OF REVIEW**

¶10 We review a district court's rulings on a motion to suppress to determine whether the court's findings of fact are clearly erroneous and whether the court's interpretation and application of the law are correct. *State v. Spaulding*, 2011 MT 204, ¶ 13, 361 Mont. 445, 259 P.3d 793; *State v. Seaman*, 2005 MT 307, ¶ 10, 329 Mont. 429, 124 P.3d 1137. "We review cases that originate in justice court and are appealed to district court 'as if the appeal originally had been filed in this Court.'" *State v. Gai*, 2012 MT 235, ¶ 11, 366 Mont. 408, 288 P.3d 164 (citing *State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646). "We examine the record independently of the district court's decision" to review the trial court's findings, conclusions, and ruling. *Ellison*, ¶ 8. "We will affirm the district court when it reaches the right result, even if it reaches the right result for the wrong reason." *Ellison*, ¶ 8.

5

## DISCUSSION

¶11 *Whether the District Court erred by affirming the Municipal Court's denial of Marcial's motion to suppress based on the Community Caretaker Doctrine?*

¶12 We adopted the community caretaker doctrine in *State v. Lovegren*, 2002 MT 153, 310 Mont. 358, 51 P.3d 471. We quoted *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528 (1973), in which the United States Supreme Court stated:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

*Lovegren*, ¶ 17. After conducting an extensive review of the authority governing the community caretaker function and the approaches used in other jurisdictions, we adopted the following test:

> First, as long as there are objective, specific and articulable facts from which an experienced officer would suspect that a citizen is in need of help or is in peril, then that officer has the right to stop and investigate. Second, if the citizen is in need of aid, then the officer may take appropriate action to render assistance or mitigate the peril. Third, once, however, the officer is assured that the citizen is not in peril or is no longer in need of assistance or that the peril has been mitigated, then any actions beyond that constitute a seizure implicating not only the protections provided by the Fourth Amendment, but more importantly, those greater guarantees afforded under Article II, Sections 10 and 11 of the Montana Constitution as interpreted in this Court's decisions.

*Lovegren*, ¶ 25.

¶13 The community caretaker doctrine encapsulates certain police-citizen encounters that are "unrelated to the detection and investigation of crime." *Seaman*, ¶ 15; *see also Lovegren*, ¶ 16; *State v. Graham*, 2007 MT 358, ¶ 25, 340 Mont. 366, 175 P.3d 885;

6

*Spaulding*, ¶ 18. Community caretaker functions exercised by police officers may include "assisting motorists who are stranded, involved in accidents, or otherwise in need of assistance." *Seaman*, ¶ 15 (citing *Lovegren*, ¶ 17). We have explained that "the community caretaker doctrine cannot be used as a pretext for an illegal search and seizure," *Spaulding*, ¶ 24 (citing *Lovegren*, ¶ 23), and the stop must actually involve a "welfare" check. *Compare i.e. Seaman*, ¶ 23 (officer conducted a "welfare" check to determine whether Seaman's car was disabled or if Seaman was experiencing medical or physical problems), *with Graham*, ¶ 30 (officer "did not stop and question Graham in order to assist them, but instead to 'move them along.'"). Providing assistance to a motorist in peril or helping a person in need of aid is commonly viewed as an affirmative duty of a police officer. *Seaman*, ¶ 15; *Lovegren*, ¶ 26.

¶14 The doctrine recognizes that not all contact between law enforcement officers and citizens involves a "seizure" implicating the Fourth Amendment. *Seaman*, ¶ 13 (citing *Lovegren*, ¶ 13); *Graham*, ¶ 26. Although we stated in *Spaulding* that "[i]n the usual case, a welfare check by its very nature necessarily involves a brief seizure—but a seizure nonetheless—in order for the officer to ascertain whether the citizen needs assistance or is in peril," we nonetheless recognized that "[t]here may be fact-specific situations in which a welfare check does not involve a seizure." *Spaulding*, ¶¶ 18, 19. "Each community caretaker case turns on its discrete facts." *Spaulding*, ¶ 29.

¶15 It is our observation that the caretaker doctrine is increasingly being offered by the State as an alternate justification for police contact in addition to particularized suspicion

7

of criminal activity. We underscore the doctrine's intended application to situations where a citizen "is in need of help or is in peril," thus authorizing an officer "to render assistance or mitigate the peril," *Lovegren*, ¶ 25, in cases "unrelated to the detection and investigation of crime." *Seaman*, ¶ 15. A caretaker inquiry should not typically require a seizure. This caretaker premise is important, given Montana's express right to privacy and protection against unreasonable searches and seizures. Mont. Const. art. II, §§ 10, 11. As one commentator cautions, "[t]he restraint of a person's liberty under the public servant exception cannot exceed the purpose of that exception—to determine if aid is necessary. The officer cannot constitutionally take any action that extends beyond the public servant role without another justification." Mary Elisabeth Naumann, *The Community Caretaker Doctrine: Yet Another Fourth Amendment Exception*, 26 Am. J. Crim. L. 325, 341 (Spring 1999).

¶16 Marcial and the State both advance arguments urging us to modify the test we adopted in *Lovegren*. Marcial argues that a community caretaker check, like an investigative stop under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), is a seizure that is constitutionally permissible only if the officer can identify objective, specific, and articulable facts justifying a warrantless intrusion throughout the entire course of the procedure. In contrast, the State argues that "[w]elfare checks are not by their very nature seizures" and "if a defendant can show he was seized—for whatever reason—the State may nonetheless demonstrate the seizure was reasonable under the Fourth Amendment pursuant to the community caretaker doctrine if it can show objective,

8

specific and articulable facts existed from which an experienced officer would have suspected a citizen was in need of help or was in peril."[1] We reject these entreaties to modify the *Lovegren* test. Rather, its application must be limited to proper cases.

¶17 Police officers are "vested by law with a duty to maintain public order and make arrests for offenses while acting within the scope of the person's authority." Section 46-1-202(17), MCA. Law enforcement officers have an affirmative statutory duty to investigate motor vehicle accidents pursuant to § 61-7-109(3), MCA, which reads:

> A law enforcement officer who in the regular course of duty investigates a motor vehicle accident in which a person is killed or injured or in which damage to the property of a person exceeds $1,000, either *at the time of and at the scene of the accident* or after the accident by interviewing participants or witnesses, shall within 10 days after completing the investigation forward a written report of the accident to the department.

Section 61-7-109(3), MCA (emphasis added). There is no requirement that police officers wait until an accident is reported to determine whether an incident they have observed first-hand requires an accident investigation. Further, officers have authority to investigate and cite motorists for traffic code violations.

¶18 "To have particularized suspicion for an investigative stop, the peace officer must be possessed of (1) objective data and articulable facts from which he or she can make certain reasonable inferences and (2) a resulting suspicion that the person to be stopped has committed, is committing, or is about to commit an offense." *State v. Wagner*, 2013 MT 159, ¶ 10, 370 Mont. 381, 303 P.3d 285. We conclude that Sgt. Munter's testimony

---

[1] We refined the "experienced officer" consideration of the particularized suspicion inquiry in *Brown v. State*, 2009 MT 64, ¶¶ 19, 20, 349 Mont. 408, 203 P.3d 842.

demonstrates that he had a particularized suspicion upon objective, articulable facts that Marcial had been involved in a property damage accident that would require an accident investigation and possible citation of Marcial under the traffic code. *See Wagner*, ¶ 16 (vehicle straddling two lanes for 500-600 feet was particularized suspicion for violation of § 61-8-328(1), MCA, which requires motorists to operate a vehicle "as nearly as practicable entirely within a single lane."); *Brown v. State*, 2009 MT 64, ¶ 23, 349 Mont. 408, 203 P.3d 842 (a "barely moving" vehicle along a public roadway at 2:51 a.m. suddenly pulling over, coming to a stop, and shutting off its lights constituted particularized suspicion of DUI); *State v. Luckett*, 2007 MT 47, ¶ 11, 336 Mont. 140, 152 P.3d 1279 (slow driving and weaving was particularized suspicion of careless driving or DUI); *State v. Brander*, 2004 MT 150, ¶ 9, 321 Mont. 484, 92 P.3d 1173 (vehicle going 35 mph in a 70 mph zone, weaving, and crossing fog line was particularized suspicion of careless driving and DUI). Sgt. Munter witnessed Marcial's vehicle make an unexpected hard left turn into an area with no cross streets, drive up on the sidewalk and onto the grass, and come to an abrupt stop nearly perpendicular to the street at 1:15 a.m. Sgt. Munter then observed a fire hydrant that was in a position indicating it could have been hit by Marcial's vehicle, thus explaining the abrupt stop. His subjective feelings notwithstanding, Sgt. Munter's observation of objective data and facts gave rise to a particularized suspicion to approach Marcial's vehicle to inquire and investigate whether an accident requiring further police investigation and citation had occurred.

10

¶19 After making contact with Marcial, Sgt. Munter observed definite signs of intoxication, giving him particularized suspicion to expand the investigation into a possible DUI, ultimately leading, after Marcial failed several standard field sobriety tests, to Marcial's arrest for DUI. This escalation of events leading to Marcial's arrest is appropriate under our decision in *Hulse v. DOJ, Motor Vehicle Dev.*, 1998 MT 108, 289 Mont. 1, 961 P.2d 75. *See also i.e. State v. Larson*, 2010 MT 236, ¶ 25, 358 Mont. 156, 243 P.3d 1130; *Brander*, ¶ 8.

¶20 The District Court did not err by denying Marcial's motion to suppress. Though the District Court based its reasoning on the community caretaker doctrine, the motion was appropriately denied on the ground that there was particularized suspicion for the stop. "We will affirm the district court when it reaches the right result, even if it reaches the right result for the wrong reason." *Ellison*, ¶ 8.

¶21 Affirmed.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ LAURIE McKINNON